# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| WUHAN HEALTHGEN BIOTECHNOLOGY CORP., et al., | ) ) ) |
| Plaintiffs, | ) ) Case No. 24-4089-KHV-ADM |
| v. | ) ) ) |
| EXPRESSTEC LLC, et al. | ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM AND ORDER

This case involves competing patent rights between Plaintiffs/Counter-Defendants Wuhan Healthgen Biotechnology Corporation and Healthgen Biotechnology Co., Ltd. (collectively, "Healthgen") and Defendants/Counterclaimants InVitria, Inc., Ventria Bioscience Inc., and ExpressTec LLC's (collectively, "InVitria"). Healthgen and InVitria are essentially the only manufacturers of plant-derived recombinant human serum albumin ("rHSA") in the world, and hence are direct competitors. Healthgen brought this lawsuit asserting that InVitria has infringed Healthgen's U.S. Patent Nos. 9,951,100, 10,183,984, and 10,730,926 (collectively, the "asserted patents"). (ECF 1 ¶¶ 4, 42–67, at 2, 14–19.)[1] The asserted patents are generally directed to methods for extracting and purifying rHSA from rice grain using processing techniques, including specified chromatography steps and/or buffers, to produce high-purity rHSA. Healthgen accuses InVitria's manufacturing and purification processes for certain of its rHSA products of infringement.

---

[1] InVitria asserts counterclaims seeking a declaratory judgment of noninfringement and invalidity of Healthgen's asserted patents, and a counterclaim against Healthgen for infringement of InVitria's U.S. Patent No. 11,492,389. (*Id.* ¶¶ 30–61, at 27-32.)

This matter is now before the court on InVitria's Motion for Protective Order. (ECF 110.) By way of this motion, InVitria seeks a protective order allowing it to redact copies of batch records for its accused rHSA manufacturing processes on the grounds that the redacted portions are irrelevant and not proportional to the needs of the case. Healthgen disputes the propriety of these redactions, contending that they shield manufacturing information about the accused processes from discovery so that no one may see this information, not even Healthgen's counsel. (ECF 112.) Alternatively, InVitria requests that the court order "source-code-type protocols restricting who may review unredacted material and under what circumstances." (ECF 110, at 4.)

For the reasons discussed below, InVitria's motion is denied. The batch records are highly relevant: they show the accused manufacturing processes. And InVitria has not met its burden to show that its proposed redactions are narrowly tailored to redact information that is not relevant or that it would suffer specific, significant competitive harm if unredacted copies are produced under the "Highly Confidential – Outside Attorneys' Eyes Only" provision of the protective order. Moreover, before this case was transferred from the United States District Court in the District of Delaware, that court already considered and rejected InVitria's alternative proposal for source-code-type protocols, and this court will not revisit that issue. The court therefore orders InVitria to re-produce these documents without redactions.

I.   BACKGROUND

InVitria and Healthgen both manufacture, market, and sell plant-derived rHSA products for clinical and medical use. (ECF 1 ¶¶ 3–4, at 2.) Both have obtained patent protection for their rHSA innovations and both have brought actions to enforce their patent rights. *See, e.g.*, *Ventria Bioscience Inc. v. Wuhan Healthgen Biotechnology Corp.*, Case No. 21-cv-04008-DDC-ADM (D. Kan.) (currently stayed pending a Federal Circuit appeal of an ITC exclusion order). In this case,

Healthgen alleges that InVitria's line of rHSA products derived from rice grain are made via processes disclosed in Healthgen's asserted patents. (ECF 1 ¶¶ 35–41, at 12–13.) Specifically, Healthgen alleges that "any one or all" of InVitria's "uses of the extraction and purification methods to prepare its rHSA products, including Optibumin, with high purity and low endotoxin levels fall within the scope" of Healthgen's patent rights. (*Id*. ¶ 40, at 13.) InVitria makes three versions of rHSA: Cellastim® S, Optibumin®, and Exbumin®. Healthgen asserts that these products plus combination products containing Cellastim® S infringe its asserted patents. (ECF 110, at 2.)

Healthgen originally filed this action on March 11, 2024, in the United States District Court for the District of Delaware. During the initial phase of the case, the court in Delaware resolved the parties' disputes over a protective order to govern discovery. (ECF 18, 37-38, 47, 51.) The parties' main point of disagreement was over InVitria's argument that the protective order should include not only the two-tier "Confidential" and "Highly Confidential" levels of protection, "but also a third 'Special Handling' level that further limits the dissemination of the most sensitive information about the parties' research and development, product formulations, and methods—similar to the protections [the] Court extends to computer source code in appropriate cases." (ECF 38, at 2.) InVitria contended that it maintains many of its "internal R&D and manufacturing processes" as trade secrets. (*Id.*) Ultimately, the court in Delaware rejected InVitria's proposal for this third-tier heightened designation. (ECF 47.) About a month later, the court granted InVitria's motion to transfer venue to this court. (ECF 57.)

While the case was still pending in Delaware, InVitria made its core technical document production pursuant to Paragraph 4(b) of the District of Delaware's Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI") (the "Delaware

3

Default Standard"). That paragraph of the Delaware Default Standard governs the initial stages of discovery in patent litigation. It required Healthgen to first identify the accused methods and the asserted patents they allegedly infringe; and, within 30 days thereafter, InVitria was required to produce "core technical documents" for the accused methods, "including but not limited to operation manuals, product literature, schematics, and specifications." Delaware Default Standard ¶ 4(a)-(b). InVitria made that production, but redacted information from its batch records for the accused rHSA manufacturing processes. (ECF 112-11, at 3-7.)[2] Healthgen repeatedly objected to these redactions as improper. (*Id.*)

Upon transfer to this court, this court set a status conference to discuss transfer logistics, initially adopted the scheduling order from the District of Delaware, and later amended that schedule to adjust case-management deadlines to account for the time lost during transfer and to make the scheduling order deadlines consistent with this court's rules and practices. (ECF 74, 77, 78-79.) In addition, the court adopted the protective ordered entered in the Delaware case with the clarification that D. KAN. RULE 5.4.2 governs the procedures for sealed documents. (ECF 77.)

Meanwhile, InVitria continued to maintain the redactions to the batch records for the accused manufacturing processes and for its recipe for the extraction buffer used in the Optibumin® process and the Cellastim S® process. (*See* ECF 110-1—110-13.) In addition to the redactions, InVitria also designated these documents as "Highly Confidential – Outside Attorneys' Eyes Only" ("AEO") pursuant to the protective order. Healthgen does not dispute the propriety of this AEO designation, and the court finds that these materials are likely appropriately designated as such for the reasons stated in InVitria's motion and the supporting declaration from its Vice

---

[2] This is the District of Delaware counterpart to the mandatory disclosures required by this court's D. Kan. Pat. Rule 3.4(a).

4

President of Quality, Ron Backman. (ECF 110, at 5-6; 110-14.) But InVitria contends this AEO designation is not enough. It contends that further redactions are appropriate and necessary because (1) the redacted information concerns only non-accused process steps and is therefore not relevant; (2) "Healthgen can show no need for the details to prove its claims"; and (3) any purported need for the redacted information is not proportional to the potential harm to InVitria "from producing the material to its direct competitor." (ECF 110, at 8-12.)

## II.  THE DOCUMENTS THEMSELVES ARE RELEVANT

InVitria first argues that a protective order is appropriate because the redacted information is not relevant to Healthgen's claims. This argument is without merit. "Federal Rule of Civil Procedure 34 requires a party to produce or permit inspection of responsive *documents*, not just relevant information contained in those documents." *Ritchie v. Wal-Mart Stores E., L.P.*, No. 19-4067-SAC-ADM, 2020 WL 5369392, at *1 (D. Kan. Sept. 8, 2020) (emphasis in original) (citing *HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2010 WL 4792388, at *5 (D. Kan. Nov. 17, 2010)). Here, there is no question that the documents themselves are relevant. They consist of InVitria's core technical production for the accused manufacturing processes—mandatory disclosures that are required both by the Delaware Default Standard and this court's D. Kan. Pat. Rule 3.4(a). Thus, they are among the few documents that are likely to be most fundamental to Healthgen's infringement claims.

As a general rule, "a party may not unilaterally redact information from documents it produces in litigation simply because the redacted information is irrelevant or non-responsive." *Ritchie*, 2020 WL 5369392, at *1; *see also Fish v. Kobach*, No. 16-2105-JAR-JPO, 2017 WL 1373882, at *7 (D. Kan. Apr. 17, 2017); *HR Tech., Inc.*, 2010 WL 4792388, at *5-*6. Permitting indiscriminate redactions inserts "'another step in the process,' [that] would invite additional

5

discovery disputes and undermine Fed. R. Civ. P. 1's directive to construe the Rules to advance the just, speedy, and inexpensive determination of cases." *Fish*, 2017 WL 1373882, at *7 (quoting *HR Tech.*, 2010 WL 4792388, at *5). Further, redactions are "both unnecessary and potentially disruptive to the orderly resolution of the case" because parties are not ordinarily harmed by producing irrelevant or sensitive information that is already subject to a protective order restricting its dissemination and use. *HR Tech.*, 2010 WL 4792388, at *6 (quoting *Beverage Distributors, Inc. v. Miller Brewing Co.*, 2010 WL 1727640, at *4 (S.D. Ohio April 28, 2010)).

### III.   INVITRIA HAS NOT ESTABLISHED GOOD CAUSE FOR A PROTECTIVE ORDER ALLOWING THE REDACTIONS

Accordingly, the salient inquiry is whether InVitria has met its burden to show good cause for a protective order allowing the redactions. The court may, for good cause, "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). As applicable here, subsection (G) provides that the protective order may require that trade secrets or other confidential commercial information "not be revealed or be revealed only in a specified way." FED. R. CIV. P. 26(c)(1)(G); *see also Ad Astra Recovery Servs. v. Heath,* No. 18-1145-JWB-ADM, 2020 WL 5057482, at *35 (D. Kan. Aug. 27, 2020) (applying the standard in Rule 26(c)(1) to a motion for a protective order authorizing redactions). The burden is on the producing party to show the propriety of the redactions. *See Ritchie*, 2020 WL 5369392, at *2; *McNabb v. City of Overland Park*, No. 12-2331-CM-TJJ, 2014 WL 1152958, at *4 (D. Kan. Mar. 21, 2014). For example, a party may demonstrate good cause to support "narrowly tailored redactions of limited information" that is not relevant to the issues in the case "by establishing specific, significant competitive harm that would result from disclosure." *Ritchie*, 2020 WL 5369392, at *2 (citing *Ad Astra Recovery Servs.,* 2020 WL 5057482, at *10-*11); *see also Coe v. Cross-Lines Ret. Ctr., Inc.*, 342 F.R.D. 539, 548 (D. Kan. 2022) (denying protective

6

order because producing party did not demonstrate sufficient potential harm to justify redactions in relevant documents). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

### A. The Extensive Redactions Are Not Narrowly Tailored to Limited Information That is Not Relevant

Here, InVitria's redactions are not narrowly tailored to cover only limited information that is not relevant. InVitria's redactions are extensive—so much so that Healthgen complains that the redactions "greatly prejudice[ed] Healthgen's ability to prepare its infringement contentions that were due on November 22, 2024." (ECF 112, at 10.) InVitria disputes this, arguing the redacted batch records "provide adequate information for the skilled person to ascertain that InVitria's accused processes . . . do not involve the ordered sequence of three chromatography steps (cationic, anionic, hydrophobic) claimed in the '926 and '100 patents or the use of composite resins claimed in the '926 patent." (ECF 110, at 7.) As for Healthgen's '984 patent, InVitria points out that it has conceded "for purposes of this litigation that it practices all limitations of independent claim 1 except step 2's 'wherein' clause, which requires an extraction buffer comprising four ingredients," and a person skilled in the art "can directly compare the recipes for InVitria's extractions buffers" to the claimed extraction buffer without needing to see the redacted amounts of the ingredients. (ECF 110, at 7-8.) In support of this argument, InVitria submitted an employee declaration to the effect that the redacted information is not relevant and that "[n]o other details are needed to effectively compare" the claimed steps to the steps used in InVitria's processes. (ECF 110-2 ¶¶ 33-34, 58, 60.)

In response, Healthgen submitted a declaration from its expert stating that the batch records "are so heavily redacted" that he is "unable to review the steps, reagents, and manufacturing

7

conditions that are involved in InVitria's manufacturing processes." (ECF 112-1 ¶ 32.) Healthgen's expert points out that InVitria's employee "may be able to interpret the batch records based on his pre-existing knowledge as an InVitria employee, but [the expert's] review and understanding of the documents is significantly hindered by the redactions that have been applied" because he needs to "review the full scope of relevant technical information" to offer an opinion. (*Id*. ¶¶ 34-36.) He further states that he is unable to determine whether specific steps are performed or certain conditions are met based on the unredacted section headings alone, without "additional unredacted context" to draw from. (*Id*. ¶¶ 44-45.)

Based on the court's review of the asserted patents and the unredacted versions of the documents submitted in camera, it appears that the redacted information likely provides necessary context for Healthgen's expert and hence is likely relevant to Healthgen's patent infringement claims, particularly under the broad definition of relevance. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (ruling relevance should be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case"). For example, Healthgen's expert explains that, "[g]iven the interconnected nature of the various steps involved in extracting and purifying rHSA, the buffer compositions in various steps of the process are relevant to an analysis of the overall process used to make the Accused Products." (ECF 112-1 ¶ 52.) Healthgen's expert also points out that at least one of the asserted claims in the '984 patent explicitly describes the amount of each listed ingredient in the extraction buffer, so such details are relevant to literal infringement, infringement under the doctrine of equivalents, and any copying analysis by the experts. (*Id*. ¶¶ 53-54.) In addition, the expert notes that access to the unredacted batch records is necessary to understand if, how, and when InVitria's manufacturing processes changed during the alleged infringement period

8

and to confirm that the manufacturing process for each of the secondary products is the same as the manufacturing process for the primary products accused of infringement.  (*Id*. ¶¶ 55-58.)

In sum, InVitria's redactions are not narrowly tailored.  Furthermore, they are so extensive that the court cannot find at this procedural juncture that the information redacted from the batch records has no bearing on Healthgen's patent infringement claims.  So, they also are not targeted to limited information that is not relevant to the issues in the case.

### B. InVitria Has Not Established Specific, Significant Competitive Harm That Would Result from Producing the Unredacted Documents Under the AEO Designation

A party seeking a protective order must establish that the information sought is indeed a trade secret or other confidential research, development, or commercial information.  *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1190 (10th Cir. 2009).  The movant must also show that disclosure of the information might be harmful.  *Id.*  To do this, the movant must demonstrate that disclosure would "result in a clearly defined and very serious injury, such as showing the competitive harm that would befall it by virtue of the disclosure of the trade secrets or other highly-confidential proprietary information."  *In re Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL-JPO, 2017 WL 386835, at *2 (D. Kan. Jan. 27, 2017) (internal quotation omitted).  To establish such an injury under the good-cause standard for a protective order, a party must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981).

Here, InVitria has not met this burden because it has not established what specific, significant competitive harm would result from producing the documents in unredacted form under the AEO designation in the protective order—*i.e.*, why the AEO designation is not sufficient.  InVitria contends that its "batch and other manufacturing records are its most valuable assets and are closely guarded as such" and that Healthgen's need for the unredacted records "is outweighed

9

by the harm that could result to InVitria if its trade-secret manufacturing processes are either inadvertently disclosed to Healthgen or actively pursued and stolen by Chinese bad actors." (ECF 110, at 9, 11.) InVitria asserts that, "[i]f every step and sub-step of InVitria's rHSA extraction and purification processes were to fall into Healthgen's hands, Healthgen could compete directly against InVitria in the market using InVitria's own trade secrets, and InVitria would have no recourse." (*Id*. at 12.) In support of this argument, InVitria submitted a declaration detailing how the records are securely maintained, supervised, and tracked, and explaining that they had never before been taken from its Junction City, Kansas facility in an unredacted form. (ECF 110-14.) InVitria's motion also focuses on the harm that InVitria would suffer if the redacted information was produced to Healthgen's client representatives or was stolen by Chinese bad actors. (ECF 110, at 11.)  To illustrate its concern, InVitria specifically calls out Dr. Daichang Yang, Healthgen's co-founder and a former InVitria employee, as being "part of a Chinese government economic espionage program" and points to a theft of its trade secrets by a different former InVitria employee "with ties to a Chinese agricultural institute" who was convicted and imprisoned for conspiring to steal InVitria's trade secrets. (*Id*.; *see also id*. at 4-5.)

But even if the court credits InVitria's arguments that the accused manufacturing processes qualify for trade-secret status and that there is the risk of bad actors among Healthgen's employees, InVitria still has not articulated why the protections afforded under the AEO designation in the protective order are insufficient. Materials designated as such may only be disclosed to outside counsel of record, independent experts, fact deponents or witnesses (under strict limitations), the court, independent litigation support services, and others as to whom the producing party has given written consent. (*See* ECF 51 ¶¶ 16-17.) Materials designated AEO may not be disclosed to designated in-house attorneys or party representatives. (*Id.*) Further, Healthgen correctly

10

recognizes that "[l]aw firms routinely handle highly sensitive and proprietary information using sophisticated IT systems" and the attorneys have ethical obligations to follow the court's procedures and protective order. (ECF 112, at 11-12.) The court of course expects Healthgen's reputable outside counsel to respect these obligations and it appears they are sufficiently sophisticated to do so. Thus, the court finds that InVitria has not set forth a particular and specific demonstration of fact establishing that it would suffer a concrete, significant competitive harm if unredacted copies were produced under the AEO provision of the protective order.

### C. The Court in Delaware Already Considered and Denied InVitria's Alternative Request for Third-Tier, Source-Code-Type Protections

Lastly, the court considers InVitria's alternative request that, if the court requires production of the information that is currently redacted, the court should impose source-code type protocols for those documents. The court in Delaware already considered and rejected a similar proposal by InVitria for a third-tier heightened level of protection beyond the AEO provision. Specifically, that court issued the following oral order on July 22, 2024, denying InVitria's request:

> Defendants' proposals for a third-tier heightened Attorneys' Eyes Only Special Handling designation, which would cover formulations, proprietary manufacturing information and technology, and product research and development records, among other information, is REJECTED. Defendants argue that protections similar to those imposed on source code review are necessary in this case for non-source code materials due to the history of relations between the parties. Although Defendants acknowledge that Plaintiffs' outside U.S. counsel is not likely to knowingly disseminate protected information to Plaintiffs or other foreign competitors, Defendants are concerned about breaches into Plaintiffs' attorneys' information storage and security systems by foreign actors. But the parties have a history of litigation on similar subject matter before the ITC and the U.S. District Court for the District of Kansas, and there is no indication that such restrictive measures were imposed in those proceedings or that a breach of sensitive data occurred in those proceedings due to a lack of protections. Defendants cite no authority supporting the extension of source code-level protections to non-source code information. Having rejected Defendants' proposed Special Handling

> designation, the court finds that the parties' dispute about whether access to Special Handling information should be restricted to U.S. citizens is moot. Plaintiffs' competing proposals at paragraphs 6, 7, 8(a), 8(c), 8(d), 17(a)-(h), 22, and 29 are ADOPTED.

(ECF 47 (citations omitted).)

InVitria now attempts to re-argue the same points here, but has not provided any reason to persuade the court that it should reconsider the Delaware court's previous ruling rejecting this proposal. InVitria did not file objections to the magistrate judge's order rejecting that proposal. And after this court adopted the protective order entered by the court in Delaware, InVitria did not timely seek reconsideration of that ruling. That protective order already accounts for protecting the redacted information under the AEO designation, which specifically protects "proprietary manufacturing information and technology; research and development records regarding actual products currently under development; . . . and any other documents, materials, or information that the Producing Party reasonably and in good faith believes is entitled to such extraordinary protection." (ECF 51 ¶ 5, at 3-4.) And, to the extent that InVitria is concerned about experts having access to the unredacted batch records, perhaps even outside the United States, the protective order provides a procedure for InVitria to lodge objections before the expert is cleared for disclosure. (*Id.* ¶ 20, at 12-13.) The court is therefore unpersuaded that the heightened protections afforded by the AEO designation are insufficient to protect InVitria from the significant competitive harm it conjectures.

**IT IS THEREFORE ORDERED** that InVitria's Motion for Protective Order (ECF 110) is denied. InVitria must re-produce the documents without redactions on or before **February 14, 2025**.

**IT IS SO ORDERED.**

Dated February 7, 2025, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
