IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WUHAN HEALTHGEN BIOTECHNOLOGY )
CORPORATION, et al., )
)
Plaintiffs, )        CIVIL ACTION
)
v. )        No. 24-4089-KHV
)
EXPRESSTEC LLC, et al., )
)
Defendants. )
_____ )

## MEMORANDUM AND ORDER

On March 11, 2024, Wuhan Healthgen Biotechnology Corporation and Healthgen Biotechnology Co., Ltd. (collectively, "Wuhan") filed suit against ExpressTec, LLC, Ventria Bioscience, Inc. and InVitria, Inc. (collectively, "Ventria"). Wuhan alleges that in violation of the Patent Act, 35 U.S.C. § 271, Ventria has infringed one of its method patents for extracting, isolating and purifying recombinant human serum albumin ("rHSA") from transgenic rice grain.[1] See Complaint (Doc. #1) filed March 11, 2024. On May 2, 2024, Ventria filed counter-claims against Wuhan (1) seeking declaratory judgment that defendants are not infringing plaintiffs' patents, (2) seeking declaratory judgment that plaintiffs' patents are invalid and (3) asserting that plaintiffs are infringing defendants' patent. See Answer, Separate Defenses & Counterclaims (Doc. #13) filed May 2, 2024.

This matter is before the Court on Plaintiffs' Opening Claim Construction Brief (Doc. #153) filed March 21, 2025 and Defendants' Opening Claim Construction Brief (Doc. #154) filed

---

[1]    Wuhan originally alleged that Ventria infringed three of its method patents, but on May 23, 2025, withdrew its infringement allegations for two of the patents. Because the disputed terms are found within the remaining patent, Wuhan's withdrawal does not affect the claim construction issues before the Court.

March 21, 2025, in which the parties ask the Court to construe disputed terms as a matter of law under <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370 (1996).  The Court has considered information submitted in the parties' briefs, responses and replies as well as oral arguments presented at the <u>Markman</u> hearing on May 12, 2025, and construes the disputed terms as explained below.

## <u>Legal Standard</u>

The construction of a patent is a question of law for the Court.  <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996).  A patent must describe the "exact scope of an invention and its manufacture to secure to the patentee all to which he is entitled and to apprise the public of what is still open to them."  <u>Id.</u> at 373 (internal quotations omitted).  To determine whether the patent claim covers the alleged infringer's actions, the Court must decide what the words in the claim mean.  <u>Id.</u> at 374.

The Court should first consider the language of the claims themselves.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  The Court should generally give terms their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question [("POSA")] at the time of the invention, <u>i.e.</u> as of the effective date of the patent application."  <u>Id.</u> at 1313.  The ordinary meaning of a claim term prevails except when a patentee (1) sets out a definition and acts as its own lexicographer in the patent specification or (2) disavows the full scope of a claim term either in the specification or during the prosecution.  <u>Thorner v. Sony Comput. Ent. Am. LLC</u>, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

The patent's claims do not stand alone, however, and the Court must read the claims "in the view of the specification of which they are a part."  <u>Id.</u> at 1315.  According to the Federal Circuit, the specification is the best guide to the meaning of the disputed term and is usually

dispositive.  Id.  The Court should also consider the patent's prosecution history to help determine how the inventor understood the patent during the process of securing and explaining it.  Id. at 1317.

The Court may also consider extrinsic evidence, which includes expert and inventor testimony, dictionaries and learned treatises.  Id.  Extrinsic evidence, however, is less reliable than intrinsic evidence such as the specification and prosecution history.  Id.

## Analysis

The parties dispute the construction of language in defendants' '389 Patent and plaintiffs' '100 Patent.

**I.    Defendants' '389 Patent**

On November 8, 2022, defendants were awarded U.S. Patent No. 11,492,389 ("'389 Patent").  The parties dispute the construction of the following terms in the '389 Patent, on which defendants base their infringement counter-claim.

A.    Preamble Of Claims 1 And 24

Claim 1 and Claim 24 have identical preambles.  Claim 1 states:

> The invention claimed is:
> 1. A cell culture media supplement or complete media composition *for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition,* said cell culture media supplement or complete media composition comprising a plant-produced heterologous protein, wherein said plant-produced heterologous protein is recombinant human albumin, said recombinant human albumin comprising:
>> i) less than 1 EU of endotoxin/mg of albumin; and
>> ii) less than 10 ppm detergent

'389 Patent (Doc. #153-3) filed March 21, 2025 at 87 (emphasis added).  Claim 24 similarly states:

> 24. A cell culture media supplement or complete media composition *for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition,* said cell culture media supplement or complete media composition comprising a plant-produced heterologous protein, wherein said plant-produced heterologous protein

is recombinant human albumin, said recombinant human albumin comprising:
    i) less than 1 EU of endotoxin/mg of albumin; and
    ii) a monocot seed component, wherein said monocot seed component is a
    plant carbohydrate or plant lipid.

Id. at 88 (emphasis added).  Plaintiffs propose that the Court construe both preambles to be limiting and indefinite in their entireties.  Defendants propose that the Court construe only the first portion of the preamble to be limiting—"A cell culture media supplement of complete media composition"—and none of the preamble to be indefinite.

### 1.      Whether The Entire Preamble Is Limiting

If the Court determines that the preamble is not limiting, the scope of the claim is broader.  Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC, 962 F.3d 1362, 1367 (Fed. Cir. 2020).  A preamble is limiting if it recites the essential structure of steps, or if it is "necessary to give life, meaning, and validity" to the claim.  Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002).  If the preamble serves as antecedent basis for a term appearing in the body of a claim, it may be limiting.  In re Fought, 941 F.3d 1175, 1178 (Fed. Cir. 2019).  A preamble is not limiting, however, "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  Id.  When only a portion of the preamble provides necessary structure for the claim, it does not necessarily convert the entire preamble into a limitation, especially if it merely states the intended use of the invention.  TomTom, Inc. v. Adolph, 790 F.3d 1315, 1323 (Fed. Cir. 2015).

Plaintiffs argue that the entire preambles are limiting because they set forth the essential purpose of the claims.  In support, plaintiffs assert that (1) the patent specification supports the view that the preambles are limiting by repeatedly making clear that "improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition" is an essential feature of the claims; (2) the patent repeatedly

references "the present invention" as one used to improve cell viability, growth and/or productivity; (3) the prosecution history described the purported invention as being directed to promoting cell growth; (4) the preambles of related patents '951 and '974 recite similar language directed to enhancing or improving cell growth in culture; and (5) the phrase "a cell culture media supplement or a complete media composition" provides the antecedent basis for that limitation in the rest of the claim.[2]  Plaintiffs' Opening Claim Construction Brief (Doc. #153) at 11, 15.

Defendants agree that the first portion of the preambles—"A cell culture media supplement of complete media composition"—is limiting but argue that the second portion—"for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition"—is not limiting because it merely states the intended use of the claimed invention, and it does not recite essential structure of steps, provide antecedent basis for the terms in the claim body or otherwise give life, meaning or vitality to the claim.  In support, defendants assert that (1) the abstract does not state that the cell culture media supplements or complete media compositions described in the abstract are limited by the "present invention" language to the use or purpose of "improving the growth, viability, and/or productivity of cell culture;"  and (2) plaintiffs agreed to split the preamble of Claim 1 of the '951 Patent in the same way that defendants request to split the preamble of the '389 Patent, which shows that the preamble can be neatly packaged into separate portions.

_____

[2]        Specifically, plaintiffs argue that "*A* cell culture media supplement or complete media composition" provides antecedent basis for "*said* cell culture media supplement or complete media composition comprising. . ."  Importantly, plaintiffs do not argue that the disputed portion of the preamble—"for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition"—provides antecedent basis, and the Federal Circuit has held that if only a portion of the preamble recites essential structure or provides antecedent basis, it does not convert the entire preamble into a limitation.  TomTom, 790 F.3d at 1323.

The Court finds that the second part of the preambles—"for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition"—does not recite the essential structure of steps and is not necessary to give life, meaning and validity to Claims 1 or 24. In fact, it seems to merely state the intended use of the claimed invention, and the claim bodies define structurally complete inventions without the disputed language:

> cell culture media supplement or complete media composition comprising a plant-produced heterologous protein, wherein said plant-produced heterologous protein is recombinant human albumin, said recombinant human albumin comprising:
>> i) less than 1 EU of endotoxin/mg of albumin; and
>> ii) less than 10 ppm detergent. . .

> cell culture media supplement or complete media composition comprising a plant-produced heterologous protein, wherein said plant-produced heterologous protein is recombinant human albumin, said recombinant human albumin comprising:
>> i) less than 1 EU of endotoxin/mg of albumin; and
>> ii) a monocot seed component, wherein said monocot seed component is a plant carbohydrate or plant lipid.

'389 Patent (Doc. #153-3) at 87–88; see STX, LLC v. Brine, Inc., 211 F.3d 588, 591 (Fed. Cir. 2000) (preamble phrase "which provides improved playing and handling characteristics" in claim for lacrosse stick head not limitation because phrase was self-contained description that could stand alone with or without preamble). The Court therefore finds that only the beginning of the preamble—"A cell culture media supplement or complete media composition"—is limiting. The phrase "for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition" does not limit the scope of the patent.

### 2.    Whether The Preamble Is Indefinite

A claim is indefinite "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the

art about the scope of the invention." <u>Ironburg Inventions Ltd. v. Valve Corp.</u>, 64 F.4th 1274, 1284 (Fed. Cir. 2023) (quoting <u>Nautilus, Inc. v. Biosig Instruments, Inc.</u>, 572 U.S. 898, 901 (2014)). If a patent's claims are indefinite, then the patent is invalid. <u>Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC</u>, 57 F.4th 1001, 1008 (Fed. Cir. 2023).

Plaintiffs argue that the preambles are indefinite because the phrase "compared to cells grown without said supplement or complete media composition" would not be reasonably clear to a POSA. The specification does not provide a definition for "complete media composition," but plaintiffs assert that it is generally understood in the art that a complete media composition is a cell culture media with the necessary components for cell growth. Plaintiffs claim that a POSA would not understand how to compare cells grown with a complete media composition to cells grown without a complete media composition, because it is impossible to grow cells without a complete media composition, and therefore the preamble is indefinite.

Defendants argue that the preamble is not indefinite because, as plaintiffs admit, a POSA would understand that a "complete media composition" is "a cell culture media with the necessary components for cell growth." Further, the claims of the '389 Patent do not require a comparison to cells grown without *a* complete media composition, the claims require a comparison between cells grown without *said* (<u>i.e.</u> the claimed) complete media composition. Based on simple rules of English grammar, "said" modifies both "supplement" and "complete media composition." Thus, defendants argue that a POSA would understand that the preamble refers to a comparison between cultured cells grown with the invention cell culture media supplement or complete media composition (<u>i.e.</u> "said supplement or cell complete media composition") and cultured cells grown with some other supplement or complete media composition (<u>i.e.</u> a media composition not comprising the invention elements recited in the body of the claim).

The parties agree that a POSA would understand "complete media composition" to mean "a cell culture media with the necessary components for cell growth." Accordingly, the term "complete media supplement" is not indefinite, and the patent is not invalid on that ground.

B.    "Less Than 10 ppm Detergent"

Plaintiffs argue that the Court should construe this term to mean less than 10 ppm detergent but more than 0 ppm. Plaintiffs claim that the intrinsic evidence shows that the invention of the '389 Patent is directed to compositions of rHSA with at least some detergent. The inventors of the patent used detergent during the purification process, and it is practically impossible to completely remove the detergent from the final product. Plaintiffs claim that the patent covers a process for lowering but not eliminating the detergent, based on the inventors' descriptions and the specification.

Defendants claim that the Court should construe the term to include 0 ppm, because 0 is less than ten. In support, defendants claim that detergent is an optional part of the process and that it is possible to remove 100 per cent of the detergent. In fact, the specification does not state that the present invention is limited to or requires the use of detergent.

Plaintiffs have not presented evidence that defendants (1) set out a definition and act as their own lexicographer in the patent specification or (2) disavow the full scope of the claim term either in the specification or during the prosecution. See Thorner, 669 F.3d at 1365. Because it is possible to completely eliminate detergent, and detergent is not a required part of the process, the Court adopts the plain and ordinary meaning of the term "less than 10 ppm detergent" which does not artificially exclude 0 ppm. Therefore, the fact that an otherwise infringing process results in 0 ppm detergent does not negate infringement.

C.    "Protein Extract"

Plaintiffs argue that the Court should construe this term to mean "an unpurified extract where the protein fraction of the flour has been separated from the carbohydrate fraction." Plaintiffs argue that this definition is necessary to clarify the term for the trier of fact, and that it is consistent with the specification's explanation.

Defendants argue that the Court should construe this term in accordance with its ordinary meaning, i.e. "the protein fraction that has been extracted from the source."  Defendants argue that the term is self-defining, and plaintiffs' definition imports numerous limitations from the specification.  Specifically, defendants argue that (1) "source" is a stand-in for three possible sources recited in the claims, (2) their claimed ordinary meaning is supported by scientific literature and (3) the word "unpurified" in plaintiffs' proposed construction does not appear anywhere in the '389 Patent claims or specification.

The specification states:

> The term "seed product" includes, *but is not limited to*, seed fractions such as de-hulled whole seed, flour (seed that has been de-hulled by milling and ground into a powder) a seed extract, preferably a protein extract (where the protein fraction of the flour has been separated from the carbohydrate fraction), malt (including malt extract or malt syrup) and/or a purified protein fraction derived from the transgenic grain.

'389 Patent (Doc. #153-3) at 39 (emphasis added).  The specification language "but is not limited to" indicates that the examples listed are not limiting.  The parenthetical phrase "where the protein fraction of the flour has been separated from the carbohydrate fraction" is but one embodiment of a "protein extract."  Plaintiffs' proposed construction improperly imports "the protein fraction of the flour has been separated from the carbohydrate fraction" as a requirement.  Further, the scientific literature demonstrates that the ordinary meaning of "protein extract" is a protein fraction extracted from a source and does not indicate that it is limited to unpurified protein.  Accordingly,

the Court construes the term "protein extract" as "the protein fraction that has been extracted from the source."

## II.     Plaintiffs' '100 Patent

On April 24, 2018, plaintiffs were awarded U.S. Patent No. 9,951,100 ("'100 Patent"). Plaintiffs claim that defendants infringe the '100 Patent, whose method claims involve a series of purification steps.

### A.     Construction Of The Terms Is Necessary

On paper, the parties dispute the meaning of three "chromatography" terms found in the '100 Patent: (1) "anion exchange chromatography," (2) "cation exchange chromatography" and (3) "hydrophobic chromatography."

If the ordinary meaning of claim language is readily apparent to lay people, claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314. Here, the meaning of the disputed terms is not readily apparent to lay people, so if the Court were to construe these terms, it would determine what a POSA would have understood the disputed claims to mean. Defendants propose constructions that they believe capture the ordinary meaning of the terms as understood by a POSA. Plaintiffs rejected defendants' proposed construction but until the Markman hearing, suggested no alternative beyond stating that the Court should give the terms their plain and ordinary meaning. At the Markman hearing, plaintiffs proposed alternative constructions of the disputed terms. Plaintiffs conceded, however, that they are "not aware of a manner in which [the construction of these terms] will have a practical impact in the case at his point," and that they are "not aware of a specific dispute with respect to infringement or validity that's impacted by this construction." Transcription Of Markman Hearing (Doc. #168) filed May 28, 2025 at 61:11–19.

Plaintiffs stated that they had an "interest" in how these terms are construed because the issue could come up in other proceedings, "as opposed to a specific dispute that really animates the infringement analysis in this case." Id. at 60:24–61:4. A conflict therefore exists only on paper and to satisfy plaintiffs' curiosity.

The Court can only deviate from the plain and ordinary meaning of a term when (1) a patentee sets out a definition and acts as its own lexicographer in the patent specification or (2) a patentee disavows the full scope of a claim term either in the specification or during the prosecution. Thorner, 669 F.3d at 1365. While it is true that defendants have not presented evidence of lexicography or disavowal, defendants' construction purports to define the plain and ordinary meaning of the terms, not deviate from it.

B.    "Anion Exchange Chromatography"

Defendants propose that the Court should construe the term "anion exchange chromatography" to mean "a chromatography-based separation that uses a positively charged ion exchange resin to bind negatively charged molecules." Plaintiffs initially proposed that the Court simply apply the "plain and ordinary meaning" of the term, but at the Markman hearing proposed that the Court define it as a chromatography-based separation that uses "an ion exchange medium having a positive charge to bind molecules having a negative charge." Plaintiffs critiqued defendants' proposed construction, arguing that (1) defendants' proposed construction incorrectly ignores nuances in charge interactions by referring to "a positively charged ion exchange resin" instead of "an ion exchange medium having a positive charge" and (2) defendants' proposal improperly narrows to chromatography using "resins" instead of "mediums" more broadly.

In response, defendants assert that their proposed construction accurately reflects the term's plain and ordinary meaning because (1) it aligns with plaintiffs' definition in the complaint,

(2) it does not exclude the nuanced possible scenarios which plaintiffs mention,[3] (3) plaintiffs' nuances do not affect the process step of performing anion exchange chromatography, (4) the limitation already exists in the claims, so defendants' construction does not improperly import a resin limitation and (5) a POSA would understand that the anion exchange chromatography step is performed using a resin.

The parties do not seriously disagree that defendants' proposed construction accurately reflects the plain and ordinary meaning of "anion exchange chromatography." Accordingly, the Court adopts defendants' proposed construction.

C.    "Cation Exchange Chromatography"

Defendants propose that the Court construe the term "cation exchange chromatography" to mean "a chromatography-based separation that uses a negatively charged ion exchange resin to bind positively charged molecules." Again, plaintiffs initially proposed that the Court apply the "plain and ordinary meaning" of the term, but at the Markman hearing, proposed the following alternative construction: a chromatography-based separation that uses "an ion exchange medium having a negative charge to bind molecules having a positive charge" instead of "a negatively charged ion exchange resin to bind positively charged molecules."

The parties' arguments are identical to the arguments presented for the construction of

---

[3]    Plaintiffs argue that defendants' proposed construction excludes more complex charge profiles and interactions relating to a molecule's charge in solution which would be understood by a POSA, so defendants' construction is inconsistent with the full scope of the plain and ordinary meaning of the term.

It is the charge of the chromatography resin—not the charge of the molecules that are being bound to the chromatography resin—that dictates the type of chromatography process that is being performed. Thus, the possible scenarios which plaintiffs mention do not transform or redefine the chromatography process that is being performed and defendants' proposed construction does not exclude them.

"anion chromatography." For the same reasons, the Court adopts defendants' proposed construction.

D.     "Hydrophobic Chromatography"

Defendants propose that the Court construe the term "hydrophobic exchange chromatography" to mean "a chromatography-based separation using resin with hydrophobic ligands to separate molecules based on their hydrophobicity." Again, plaintiffs initially proposed that the Court only apply the "plain and ordinary meaning" of the term, but at the Markman hearing, proposed the following alternative construction: a chromatography-based separation using "*medium*" with hydrophobic ligands to separate molecules based on their hydrophobicity, instead of "*resin*."

The parties' arguments are identical to the arguments presented for the construction of "anion chromatography" and "cation chromatography." For the same reasons, the Court adopts defendants' proposed construction.

### III.     Conclusion

The Court provides its construction for each term in the chart below:

| Term | Court's Construction |
|---|---|
| "A cell culture media supplement or complete media composition for improving growth, viability, and/or productivity of cultured cells as compared to cells grown without said supplement or complete media composition" | "A cell culture media supplement or complete media composition" is limiting.<br><br>No part of the preamble is indefinite. |
| "less than 10 ppm detergent" | a detergent concentration of less than 10 parts per million |
| "protein extract" | the protein fraction that has been extracted from the source |
| "anion exchange chromatography" | a chromatography-based separation that uses a positively charged ion exchange resin to bind negatively charged molecules |
| "cation exchange chromatography" | a chromatography-based separation that uses a negatively charged ion exchange resin to bind positively charged molecules |
| "hydrophobic chromatography" | a chromatography-based separation using resin with hydrophobic ligands to separate molecules based on their hydrophobicity |

**IT IS THEREFORE ORDERED** that the Court construes the disputed terms of the '389 and '100 Patents as set forth in this Order.

Dated this 12th day of June, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge